**No. 10-3675**

# United States Court of Appeals

### For the Seventh Circuit

---

**BOIMAH FLOMO, et al.,**
***Plaintiffs-Appellants,***

**v.**

**FIRESTONE NATURAL RUBBER CO., et al.**
***Defendant-Appellee.***

---

**Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division,
No. 1:06-cv-00627
Honorable Jane Magnus-Stinson, Presiding Judge**

---

**BRIEF FOR DEFENDANT-APPELLEE
FIRESTONE NATURAL RUBBER CO.**

---

Robert A. Mittelstaedt
David L. Wallach
JONES DAY
555 California Street, 26th Floor
San Francisco, California  94104
(415) 626-3939

Brian J. Murray
  (*Counsel of Record*)
JONES DAY
77 W. Wacker Drive, Suite 3500
Chicago, Illinois 60601
(312) 782-3939

**Oral Argument Requested**

*Attorneys for Defendant-Appellee Firestone Natural Rubber Co.*

Case: 10-3675    Document: 29    Filed: 03/30/2011    Pages: 68

## CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: 10-3675

Short Caption: Boimah Flomo, et al. v. Firestone Natural Rubber Company, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Firestone Natural Rubber Company, LLC

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Krieg Devault LLP, Jones Day

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

Bridgestone Corporation, which is publicly traded on the Nikkei Exchange in Tokyo, Japan

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: _____    Date: 3/30/2011

Attorney's Printed Name: Brian J. Murray

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [X]    No [ ]

Address: Jones Day, 77 W. Wacker Drive, Suite 3500

Chicago, IL  60601

Phone Number: (312) 782-3939    Fax Number: (312) 782-8585

E-Mail Address: bjmurray@jonesday.com

rev. 01/08 AK

**CIRCUIT RULE 26.1  DISCLOSURE STATEMENT**

Appellate Court No: 10-3675

Short Caption: Boimah Flomo, et al. v. Firestone Natural Rubber Company, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Firestone Natural Rubber Company, LLC

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Krieg Devault LLP, Jones Day

(3) If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

Bridgestone Corporation, which is publicly traded on the Nikkei Exchange in Tokyo, Japan

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: _____  Date: 3/30/2011

Attorney's Printed Name: Robert A. Mittelstaedt

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [    ]   No [ X ]

Address: Jones Day, 555 California Street, # 26

San Francisco, CA 94104-1602

Phone Number: (415) 626-3939          Fax Number: (415) 875-5700

E-Mail Address: ramittelstaedt@jonesday.com

rev. 01/08 AK

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 10-3675

Short Caption: Boimah Flomo, et al. v. Firestone Natural Rubber Company, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[  ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Firestone Natural Rubber Company, LLC

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Krieg Devault LLP, Jones Day

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

Bridgestone Corporation, which is publicly traded on the Nikkei Exchange in Tokyo, Japan

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: _D. Wallach_                    Date: 3/30/2011

Attorney's Printed Name: David L. Wallach

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [    ]   No [X]

Address:   Jones Day, 555 California Street, # 26

San Francisco, CA 94104-1602

Phone Number:   (415) 626-3939              Fax Number:   (415) 875-5700

E-Mail Address:   dwallach@jonesday.com

rev. 01/08 AK

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ..................................................... 1

ISSUES PRESENTED ...................................................................... 1

INTRODUCTION ............................................................................. 2

STATEMENT OF THE CASE .......................................................... 4

STATEMENT OF FACTS ................................................................ 6

    A.    Count II:  The ATS. ........................................................ 6

    B.    Firestone Liberia And Its Tappers. .............................. 8

    C.    The Tappers Did Not Need Assistance To Finish Their Work. ....... 9

    D.    If Tappers Wanted Assistance, They Could And Did Use Adult Helpers. ........ 11

    E.    Firestone Did Not Intend, But Rather Prohibited, The Use Of Children To Assist Tappers. ....................................... 12

    F.    The District Court's Grant Of Summary Judgment To Firestone On Count II. ............................................ 14

SUMMARY OF ARGUMENT ......................................................... 17

STANDARD OF REVIEW ............................................................... 19

ARGUMENT .................................................................................. 19

I.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO FIRESTONE ON COUNT II. ......................... 19

    A.    The District Court Correctly Held That Corporations Cannot Be Sued Under The ATS. ................................. 19

        1.    International Law Determines Who Can Be An ATS Defendant. ................................................... 20

        2.    Corporate Liability Is Not A CIL Norm. ............... 23

        3.    Appellants' Remaining Contentions Are Meritless. ........... 29

    B.    The District Court Correctly Concluded That There Is No Universally Recognized, Specifically Defined Norm Against The Alleged "Unsafe" Labor Performed By The Children That Would Support Creation Of A Federal Common Law Cause Of Action. ...................................................... 30

        1.    If Any CIL Norm Exists, It Imposes Obligations Only On States. ................................................. 31

## TABLE OF CONTENTS
(continued)

2.  Appellants Have Failed To Show A Universally Accepted CIL Norm. ......................................... 31

3.  The Norm Against Hazardous Child Labor Does Not Meet *Sosa*'s Stringent Standard of Specific Definition. ...... 33

4.  Even If A *Sosa*-Compliant "Unsafe" Child Labor Norm Existed, It Would Not Be An Appropriate Exercise Of Discretion To Create A Cause Of Action To Enforce It. ...... 36

C.  If An International Norm Prohibited Alleged "Unsafe" Child Labor, The Undisputed Evidence Entitled Firestone To Summary Judgment. ................................................................. 38

D.  The District Court Correctly Ruled That An ATS Claim Cannot Be Brought Without First Exhausting Local Remedies. ...................................................................... 42

II.  THE JUDGMENT OF THE DISTRICT COURT ALSO SHOULD BE AFFIRMED BECAUSE THE ATS DOES NOT APPLY TO CONDUCT IN FOREIGN TERRITORY. ................................................ 43

III.  THE DISTRICT COURT CORRECTLY DETERMINED THAT, IF SUMMARY JUDGMENT HAD NOT BEEN GRANTED TO FIRESTONE ON COUNT II, THE POTENTIAL LIABILITY PERIOD FOR FIRESTONE COMMENCED ON THE DATE WHEN CONVENTION 182 CAME INTO FORCE IN LIBERIA. ........................ 46

IV.  THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION AND DENYING PETITIONERS' MOTION TO AMEND. ................................... 47

CONCLUSION ............................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abdullahi v. Pfizer, Inc.*,
562 F.3d 163 (2d Cir. 2009) .................................................................. 29

*Abecassis v. Wyatt*,
704 F. Supp. 2d 623 (S.D. Tex. 2010) ...................................................... 20

*Alba v. Montford*,
517 F.3d 1249 (11th Cir. 2008) ............................................................. 37

*Aldana v. Del Monte Fresh Produce, Inc.*,
416 F.3d 1242 (11th Cir. 2005) (per curiam)........................................... 22

*Aldridge v. Forest River, Inc.*,
__ F.3d __, 2011 WL 781469 (7th Cir. Mar. 8, 2011) ................................ 50

*The Apollon*,
22 U.S. 362 (1824) ............................................................................. 46

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989) ........................................................................... 29

*Atanus v. Perry*,
520 F.3d 662 (7th Cir. 2008) ................................................................ 19

*Barrow Steamship Co. v. Kane*,
170 U.S. 100 (1898) ........................................................................... 29

*Bowoto v. Chevron Corp.*,
2006 WL 2455752 (N.D. Cal. Aug. 22, 2006),
*reh'g granted on other grounds*, 2007 WL 2349341 (Aug. 14, 2007) ........... 20

*Bowoto v. Chevron Corp.*,
557 F. Supp. 2d 1080 (N.D. Cal. 2008) .................................................... 36

*Bowoto v. Chevron Corp.*,
621 F.3d 1116 (9th Cir. 2010) ............................................................... 22

*Buchel-Ruegsegger v. Buchel*,
576 F.3d 451 (7th Cir. 2009) ................................................................ 20

*Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*,
500 F.3d 571 (7th Cir. 2007) ................................................................ 38

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
   543 U.S. 157 (2004) .................................................................. 29

*Correctional Services Corp. v. Malesko*,
   534 U.S. 61 (2001) .............................................................. 22, 23

*Cowen v. Bank United of Texas FSB*,
   No. 94 C 3838, 1995 WL 38978 (N.D. Ill. Jan. 25, 1995),
   *aff'd*, 70 F.3d 937 (7th Cir. 1995) ............................................ 50

*Dargis v. Sheahan*,
   526 F.3d 981 (7th Cir. 2008) ............................................... 19, 48

*Doe v. Nestle, S.A.*,
   No. 99-02506, 2010 WL 3969615 (C.D. Cal. Sept. 8, 2010) ................ 20, 27

*Elbex Video, Ltd. v. Tyco Int'l, Ltd.*,
   No. 06-5178, 2008 WL 1375883 (D. N.J. Apr. 9, 2008) ........................ 49

*Enahoro v. Abubakar*,
   408 F.3d 877 (7th Cir. 2005) ............................................... 22, 42

*F. Hoffman La-Roche Ltd. v. Empagran S.A.*,
   542 U.S. 155 (2004) ......................................................... 45, 46

*Filartiga v. Pena Irala*,
   630 F.2d 876 (1980) ............................................................. 7

*Flores v. So. Peru Copper Corp.*,
   414 F.3d 233 (2d Cir. 2003) ................................................... 32

*Forti v. Suarez-Mason*,
   694 F. Supp. 707 (N.D. Cal. 1988) ............................................ 36

*Glidden v. Chromallay Am. Grp.*,
   808 F.2d 621 (7th Cir. 1986) ................................................. 29

*Greene v. Dalton*,
   164 F.3d 671 (D.C. Cir. 1999) ................................................ 10

*Haynes v. Alfred A. Knopf, Inc.*,
   8 F.3d 1222 (7th Cir. 1993) .................................................. 48

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Hilao v. Estate of Marcos,*
   25 F.3d 1467 (9th Cir. 1994) .................................................... 30

*Holly v. Scott,*
   434 F.3d 287 (4th Cir. 2006) .................................................... 37

*In re Estate of Ferdinand E. Marcos,*
   978 F.2d 493 (9th Cir. 1992) .................................................... 45

*In re Urethane Antitrust Litig.,*
   683 F. Supp. 2d 1214 (D. Kan. 2010) ...................................... 49

*Johnson v. Methodist Med. Ctr.,*
   10 F.3d 1300 (7th Cir. 1993) .................................................... 50

*Khulumani v. Barclay Nat'l Bank Ltd.,*
   504 F.3d 244 (2d Cir. 2007) ........................................20, 29, 31

*Kiobel v. Royal Dutch Petroleum,*
   621 F.3d 111 (2d Cir. 2010),
   *reh'g denied,* __ F.3d __, 2011 WL 338048 (2d Cir. 2011) ................... *passim*

*Mars Inc. v. Nippon Conlux Kabushiki-Kaisha,*
   825 F. Supp. 73 (D. Del. 1993) ................................................ 49

*Murray v. The Charming Betsy,*
   2 Cranch 64 (1804) ................................................................ 45

*North Sea Continental Shelf,*
   1969 I.C.J. 3 ......................................................................... 32

*The Nurnberg Trial (United States v. Goernig),*
   6 F.R.D. 69 (Int'l Military Trib. at Nuremberg 1946) .................. 23

*The Paquete Habana,*
   175 U.S. 677 (1900) .............................................................. 28

*Peoples v. CCA Det. Ctrs.,*
   422 F.3d 1090 (10th Cir. 2005) ............................................... 37

*Pollard v. GEO Group, Inc.,*
   607 F.3d 583 (9th Cir. 2010) .................................................. 37

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
   582 F.3d 244 (2d Cir. 2009) ............................................................. 20, 29

*Romero v. Drummond Co., Inc.*,
   552 F.3d 1303 (11th Cir. 2008) ..................................................22, 29, 49

*Sarei v. Rio Tinto*,
   487 F.3d 1193 (9th Cir. 2007),
   *rev'd*, 550 F.3d 822 (9th Cir. 2008) (en banc)................................42, 43, 45

*Sarei v. Rio Tinto*,
   625 F.3d 561 (9th Cir. 2010) (en banc) .............................................. 44, 45

*Schmidt v. Eagle Waste & Recycling, Inc.*,
   599 F.3d 626 (7th Cir. 2010) ............................................................. 41

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ............................................................... *passim*

*Stayart v. Yahoo! Inc.*,
   623 F.3d 436 (7th Cir. 2010) ............................................................. 19

*Switzerland v. United States*,
   1959 I.C.J. Rep 6 ............................................................................. 42

*United Mine Workers of America v. Gibbs*,
   383 U.S. 715 (1966) ......................................................................... 48

*United States v. Palmer*,
   16 U.S. 610 (1818) ........................................................................... 44

*Weinberger v. Rossi*,
   456 U.S. 25 (1982) ........................................................................... 45

*Wiwa v. Royal Dutch Petroleum Co.*,
   226 F.3d 88 (2d Cir. 2000) ............................................................ 29, 37

## STATUTES

28 U.S.C. § 1333.............................................................................. 46

28 U.S.C. § 1350.................................................................... *passim*

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

28 U.S.C. § 1367(c) ............................................................ 2, 19, 48

Judiciary Act of 1789 § 9 ............................................................ 6

### RULES

Fed. R. Civ. P. 56(f) ............................................................ 5

Southern District of Indiana Local Rule 56.1 ............................ 14, 41

### OTHER AUTHORITIES

1 Op. Att'y Gen. 57 (1795) ........................................................ 44

134 Cong. Rec. S6876-01 (1998), 1988 WL 1091277 ....................... 33

145 Cong. Rec. S14226-03 (1999), 1999 WL 1003553 ..................... 33

21 J. Cont. Cong. 1136-37 ........................................................ 43

Allied Control Council Law No. 9 (Nov. 30, 1945), *available at*
    http://www.loc.gov/rr/frd/Military_Law/Enactments/01LAW06.pdf ....... 24

Kai Ambos, Article 25 *in* Commentary on the Rome Statute of the
    International Criminal Court: Observer's Notes, Article by Article
    (Otto Trifferer ed., 2d ed. Supp. 2008)...................................... 25

William R. Casto, *The Federal Courts' Protective Jurisdiction over Torts
    Committed in Violation of the Law of Nations*, 18 Conn. L. Rev. 467,
    485-86 n.97 (1986).................................................................. 44

Convention on the Rights of the Child, Article 32,
    1577 U.N.T.S. 3 (*entered into force* Nov. 2, 1990)....................... 31

*The End of Child Labour Within Reach* (Int'l Labour Org. 2005), available
    at
    http://www.ilo.org/public/english/standards/relm/ilc/ilc95/pdf/rep
    -i-b.pdf.................................................................................. 35

Genocide Convention, Art. 1........................................................ 25

ILO Constitution Art. 19(d) ........................................................ 32

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

ILO Convention 138 on the Minimum Age for Employment,
1015 U.N.T.S. 297 (*entered into force* June 19, 1976).....................31, 33, 47

ILO Convention 182 on the Worst Forms of Child Labour,
2133 U.N.T.S. 161 (*entered into force* Nov. 19, 2000)......................... *passim*

ILO Recommendation 190 ........................................................................... 32

International Labour Office, Report IV (2A) Child Labour, 87th Session
(June 1999), available at
http://www.ilo.org/public/english/standards/relm/ilc/ilc87/rep-
iv2a.htm.................................................................................................... 34

Matthew Lippman, *War Crimes Trials of German Industrialists: The "Other
Schindlers"*, 9 Temp. Int'l & Comp. J. 173 (1995) ...................................... 24

Report of the Crimea Conference, U.S.-U.S.S.R.-U.K. (Feb. 11, 1945) ............ 23

Report of the Special Representative of the Secretary-General on the
issue of human rights and transnational corporations and other
business enterprises, U.N. Doc. A/HRC/4/035 (Feb. 9, 2007) .......26, 27, 28

Report of the Special Representative of the Secretary-General on the
issue of human rights and transnational corporations and other
business entities, U.N. Doc. A/HRC/8/5 (Apr. 7, 2008) ............................ 28

Report of the Tripartite Advisory Panel on International Labor Standards
to the President's Committee on the International Labor Organization
Regarding Convention No. 182 ................................................33, 34, 35, 36

Restatement (Third) of Foreign Relations Law of the United States § 102 ....... 32

Restatement (Third) of Foreign Relations Law of the United States § 402 ....... 45

Restatement (Third) of Foreign Relations Law of the United States § 403 ....... 45

S. Rep. 102-249, 1991 WL 258662................................................................. 22

S. Treaty Doc. 106-5 (1999), 1999 WL 33292717 .........................15, 16, 33, 34

Torture Victim Protection Act:  Hearing and Markup before the H. Comm.
On Foreign Affairs on H.R. 1417, 100th Cong. 82 (1988)........................... 22

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

U.N. Comm. on Human Rights, Gen. Cmt. No. 3 .......................................... 27

U.N. Comm. on Human Rights, Gen. Cmt. No. 31.......................................... 26

## JURISDICTIONAL STATEMENT

Appellants' jurisdictional statement is complete and correct.

## ISSUES PRESENTED

1.      Whether the district court correctly granted summary judgment to Appellee Firestone Natural Rubber Company ("Firestone") on Count II, brought under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), because:

    a.      Corporations are not proper defendants for ATS claims;

    b.      There is no established norm of customary international law prohibiting "unsafe" child labor that could support a federal common law cause of action consistent with *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004);

    c.      If there were, no violation of that norm could be found on the undisputed evidence, which showed that Firestone did not employ any children and that, if any children worked, it was because their fathers, not Firestone, told them to do so in violation of company policy against child labor; and

    d.      Appellants failed to exhaust their Liberian remedies before bringing their ATS claim.

2.      In the alternative, whether the district court should have granted summary judgment to Firestone on Count II because the ATS does not apply extraterritorially to conduct in Liberia.

3.      Whether the district court correctly determined that, if summary judgment had not been granted to Firestone on Count II, the potential liability period commenced when International Labour Organization ("ILO") Convention 182 came into force in Liberia.

4.    Whether the district court acted within its discretion in denying Appellants' motion for leave to amend their complaint to add Liberian law claims where:

a.    That motion was brought more than three years into the lawsuit, on the same day that Firestone filed its motion for summary judgment, and granting the motion could have necessitated re-opening fact discovery; and

b.    If it had been timely, the Court still would have properly declined to exercise supplemental jurisdiction over the Liberian law claims pursuant to 28 U.S.C. § 1367(c).

## INTRODUCTION

This case began as a direct challenge by 12 adult Liberians (the "Guardians") to the terms of their employment on a latex-producing rubber tree farm in Liberia.  The Guardians worked as "tappers" under terms set out in a Collective Bargaining Agreement ("CBA") signed with Firestone Liberia, Inc. ("Firestone Liberia"), a Liberian affiliate of Firestone.  (R.1.)[1]  The Guardians claimed that, because their work "quotas" were too high and their wages too low, their employment amounted to "slave labor."  The district court dismissed those claims, noting that the only alleged coercion was economic, because work is otherwise scarce in Liberia.  (R.40.)  That dismissal is not appealed.

Only Count II survived the motion to dismiss.  In that count, the Guardians sought to challenge the same terms of their employment indirectly,

---

[1] Record materials are cited by docket number as (R.__.)  Appellants' opening brief is cited as (Op.Br.__.)  Appellants' appendix materials are cited as (A.__.)

using their children (the "Children"). Count II is a claim under the ATS by the Guardians, on behalf of the Children, who were minors when it was filed. It alleges that the Guardians' work "quotas" and low wages "forced" them to use the Children as helpers to perform "unsafe" child labor purportedly in violation of customary international law ("CIL").

The discovery responses and deposition testimony of the Guardians and the Children were so inconsistent that it was impossible to determine if any of the Children actually did any work for the Guardians. (R.165 at 7-12.) What clearly emerged, however, was that if any child worked, it was at the behest of the very person suing as his Guardian—in knowing violation of Firestone Liberia's child labor ban.[2]

The district court found that the undisputed facts entitled Firestone to summary judgment on this claim on multiple independent grounds. Consistent with *Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111 (2d Cir. 2010), *reh'g denied*, __ F.3d __, 2011 WL 338048 (2d Cir. 2011), corporations are not proper ATS defendants. Even if they were, no CIL norm could support a cause of action for the "unsafe" child labor alleged, consistent with *Sosa v. Alvarez-*

---

[2] The duplicity of this claim was displayed when the Guardians were required to state whether their Children were still working. They recognized that if they answered yes, they would be terminated under Firestone Liberia's zero tolerance child labor ban. But if they answered in the negative, and admitted they were doing their jobs without their Children's help, they would disprove their claim. Faced with that dilemma, they asked the district court to enjoin Firestone from firing them if they continued to force their Children to perform "unsafe" work. The district court declined, observing that doing so would perpetuate the very conduct that the Guardians claimed they were trying to stop. (R.569.) Appellants then asserted that many Children worked only "occasionally" (and some, like Doris Fallah, only in the past), and thus, that the Guardians could complete their jobs without them. (R.247.)

*Machain*, 542 U.S. 692 (2004).  Even if it could, the record did not support the claim—the Guardians, not Firestone, decided whether the Children would work, and what duties they would perform.  Indeed, the Children testified that they hid from Firestone Liberia management so that their Guardians would not be terminated for violating the company's child labor ban.  And in any event, Appellants failed to exhaust their Liberian remedies.

The district court's decision was correct.  The ATS does not require U.S. courts to oversee labor practices worldwide.  It certainly does not provide authority to create a cause of action here, for workers using their children to challenge employment terms agreed to by the workers' union.

## STATEMENT OF THE CASE

The Guardians sued for themselves and the Children on November 17, 2005 in the U.S. District Court for the Central District of California.  (R.2.)  They sued Bridgestone Corporation, five subsidiaries (including Firestone), and two employees of subsidiaries.  As a result of dismissals and other summary judgments, Firestone was the only remaining defendant.

The Guardians alleged principally that the terms and conditions of their employment constituted "forced labor" (and "cruel, inhuman or degrading treatment") in violation of the ATS, the U.S. Constitution's Thirteenth Amendment, and a federal statute authorizing a civil remedy for criminal violations of federal forced labor laws.  They also asserted the same claims for the Children.  On June 26, 2007, after transfer from California to the Southern

District of Indiana, then-District Judge Hamilton dismissed all claims except Count II. (R.40.) That order is not appealed.

As to Count II, although the court found that Appellants failed to state a claim for forced labor (the claim they actually pled), the court opined that an allegation that "very young children" were performing "back-breaking work that exposes them to dangerous chemicals and tools" might violate Article 3(d) of ILO Convention 182. (R.40 at 67.) Article 3(d) defines the "worst forms of child labor" to include work that is "likely to harm the health, safety or morals" of persons under 18 years of age.

On July 11, 2008, the Court denied Appellants' motion to add Indiana tort claims. (R.129.) On March 4, 2009, the Court denied class certification. (R.165.) Those orders also are not appealed.

On April 30, 2009, pursuant to the case management plan, Firestone moved for summary judgment on Count II. That same day, Appellants moved for leave to add Liberian law claims; that motion was denied. (R.548.) On June 11, 2009, the Court granted Appellants' request for additional discovery under Rule 56(f). (R.234.)[3]

On October 5, 2010, after Appellants completed the Rule 56(f) discovery and Firestone's motion was fully briefed, Judge Magnus-Stinson granted summary judgment for Firestone on Count II. In support of that ruling, the

---

[3] On November 30, 2009, the case was reassigned to Judge Lawrence after Judge Hamilton was elevated to the Seventh Circuit. (R.327.) On June 15, 2010, the case was reassigned to Judge Magnus-Stinson, who had presided over discovery in the case as a Magistrate Judge. (R.546.)

court issued two written decisions, dated October 5 and 19, 2010.  (R.604, 614.)  The court then entered final judgment.[4]  (R.615.)

## STATEMENT OF FACTS

At issue in this appeal is the district court's grant of summary judgment on Count II, a claim under the ATS for "unsafe" child labor, to Firestone, which is the only Appellee.  Many issues surrounding the alleged child labor at Firestone Liberia's farm remain disputed, including many irrelevant "facts" in Appellants' brief.  What matters, though, are the undisputed facts, which the district court found entitled Firestone to summary judgment on Count II.

### A.     Count II:  The ATS.

The ATS was enacted by the First Congress as part of Section 9 of the Judiciary Act of 1789.  It was intended to provide federal courts with jurisdiction over offenses to foreign sovereigns which, if unredressed, might provoke a war against the young and weak United States, such as the attack on a French ambassador in Philadelphia in 1784.  *Sosa*, 542 U.S. at 712-20. In its current version, the ATS reads:

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350.

In *Sosa*, the Supreme Court explained that the ATS does not, itself, create a cause of action.  542 U.S. at 713.  Rather, causes of action under the

---

[4] Firestone also moved for summary judgment on the ground that it should not be liable for the actions of its subsidiary, Firestone Liberia.  That motion was denied as moot.  (A.20 & n.1.)

ATS are created by federal common law—which provides a cause of action for a "narrow set" of "hybrid" international law rules "binding individuals" but "overlap[ping] with the norms of state relationships[.]" *Id.* at 714-15. Violations in this category when the ATS was enacted included "violations of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* at 724. There is "no basis to suspect Congress had any examples in mind beyond those" three. *Id.*

Nonetheless, the Court left open the possibility that a "narrow class of" other norms could support new federal common law claims under the ATS. But the Court emphasized that courts must exercise "great caution" before creating such new causes of action. *Id.* at 725-28. And any new tort to be recognized must be comparable to the three extreme examples Congress had in mind. That is, the international norm to be enforced must be "specific, universal, and obligatory" enough to render the perpetrator "*hostis humani generis*, an enemy of all mankind." *Id.* at 732 (quoting *Filartiga v. Pena Irala*, 630 F.2d 876, 890 (1980)). International law must also extend liability "to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." 542 U.S. at 732 n.20. The Court reiterated: while the door to recognizing new torts "is still ajar," it must be "subject to vigilant doorkeeping." *Id.* at 729. The Court added that it would "certainly consider" an exhaustion of remedies requirement in "an appropriate case." *Id.* at 733 n.21.

That is the backdrop for analyzing Appellants' request that the Court create a federal common law cause of action for violation of a supposed CIL norm prohibiting "unsafe" child labor.

### B.     Firestone Liberia And Its Tappers.

Firestone Liberia operates a rubber tree farm covering 200 square miles in Liberia.  (R.144-2 ¶2.)  To extract latex from the trees, Firestone Liberia employs nearly 3,000 "tappers."  (R.144-6 ¶2.)  Their employment terms, including the number of trees for which they are responsible (their "task") and their wages, are set by CBAs.  (R.144-8, Ex. 1-5.)  The 1999 and 2004 CBAs set the maximum number of trees per task at 650; the 2008 CBA lowered the maximum to 600.  (R.144-8, Ex. 1 at 21, Ex. 2 at 36-37, Ex. 3 at 37.)  The CBAs include grievance procedures providing for joint union and management involvement in addressing any alleged misapplication of the CBA.  (R.144-8, Ex. 1 at 15-16, Ex. 2 at 27-28, Ex. 3 at 24-25.)

To earn their base pay, tappers (i) "tap" their trees by making thin cuts in the bark to start the latex flowing; (ii) collect the liquid latex that drips into a cup attached to the tree, and the coagulated latex ("cuplump") that drips into the cup overnight; and (iii) carry the latex and cuplump to collection tanks. (R.144-8, Ex. 1 at 21-22; R.144-9 ¶¶3-10 & Ex. 1 (manually filed DVD illustrating tappers' work).)  In addition to a salary, tappers receive other benefits including free medical care, subsidized food, and retirement benefits. (R.144-8, Ex. 1 at 7-14.)  Firestone also built and runs 25 schools, all located on the farm, with an enrollment of almost 17,000 students.  (R.144-5 ¶2.)

Firestone students' standardized test scores are among the highest in the country.  (R.144-5 ¶3.)  Attendance at these schools is free of charge for the tappers' registered children.  (R.144-8, Ex. 1 at 10-11.)  All but one of the Children has been enrolled in these free schools.[5]  (R.209 at 9 & n.16.)[6]

### C.    The Tappers Did Not Need Assistance To Finish Their Work.

Appellants assert that tappers begin their day before dawn and do not finish until late afternoon, citing the deposition testimony of three Guardians.  (Op.Br.5-6.)  The cited testimony does not support the assertion.[7]  The relevant testimony established that it typically takes a tapper working alone from 6:00a.m. to 2:00 or 3:00p.m. to finish his duties, including an hour break.

[5] Appellants' effort to impugn Firestone Liberia's schools (Op.Br.11) is wrong and irrelevant.  Appellants ignore that from 1989 to 1996, and again from 2001-2002, a civil war ravaged Liberia, shut down Firestone Liberia, and destroyed its schools.  (R.144 at 11; R.144-1 ¶¶1-3 & Ex. A.)  Although Appellants assert that the 15 schools that Firestone Liberia reopened by 2004 was a "severe shortage," they cite no support for this claim.  Nor do they cite any evidence that it was "prohibitively expensive" to obtain registration cards to attend the free schools.

In addition to rebuilding its school system, Firestone Liberia has built about 1,000 new homes and has plans to build another 4,000.  (R.144-2 ¶5.)  Firestone Liberia donates hundreds of thousands of sapling rubber trees to independent farmers so that they can become self-sufficient and awards all of its construction contracts only to Liberian companies, creating yet more Liberian jobs.  (*Id.* at ¶¶5-6.)

[6] At some point, the Southern District of Indiana's electronic docketing system changed such that docket entries with dashes all were reduced by one.  Because defendants' summary judgment motion (R.209) and reply brief (R.310) were filed before this change was discovered, citations in those filings to electronic docket entries with dashes are to the immediately preceding entry.  For example, entries cited at Dkt. 144-17 are now found at Dkt. 144-16.

[7] One Guardian testified that he finishes work some days at 1:00p.m., some at 3:00p.m., and some at 4:00p.m.  (R.230-5, Ex. 2 at 39:16-20.)  Another testified that he finishes around 3:00p.m.  (R.230-10, Ex. 4 at 57:23-60:5.)  The third Guardian said nothing about when he begins or finishes work on a typical day.  (R.230-2, Ex. 1 at 24:8-12.)

(R.144-10 ¶¶3-10; R.404 at 2.)  Occasionally, tappers do "make-up tapping" (*e.g.*, if a tapper is absent, two other tappers split his job that day), for which they receive extra pay.  Even then, the job can still be completed in 8 to 9 hours.  (R.144-19, Ex. 59 at 21:15-22:17 (John Kerkula completed "double tapping" by 2:30p.m.).)[8]  In short, Appellants' own witnesses established that a tapper could do his job without any helpers, adult or child.  As a retired supervisor whose declaration Appellants introduced in opposing summary judgment later  testified:

> Q.  From what you have seen as a headman, tappers can complete their work by themselves without helpers; right?
>
> A.  Yes.

(R.404 at 1; R.296-26.)

To dispute this evidence,  Appellants rely principally on their own conclusory, self-serving assertions that "the job is too much."  (Op.Br.8 n.5; R.230-3, Ex. 1A at 86:12-19.)  Although "statements made by the party opposing a motion for summary judgment must [generally] be accepted as true," these "statements are so conclusory as to come within an exception to that rule."  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Nonetheless, out of an abundance of caution, the district court "assume[d]" that tappers could not complete their jobs without assistance.  (A.24.)

---

[8] Tappers also perform occasional "afternoon work" for extra pay.  This includes applying fungicide and stimulant once or twice a month during the highest production months, and "laying panel" (scraping a guideline in the bark for next month's tapping).  Until 2005, "afternoon work" included weeding around trees with a hoe or machete.  (R.144-10 ¶¶11-16 & Ex. 1.)

### D.     If Tappers Wanted Assistance, They Could And Did Use Adult Helpers.

Whether or not assistance is actually "necessary," some tappers use adult helpers so that they will have more free time for themselves. Some use paid helpers, who Appellants testified can be hired for about 66 cents per day. (R.144-16, Ex. 27 (Interrogatory No. 10).) Thus, a tapper can hire one or even two adult helpers and still earn nearly three times what a Liberian civil servant does. (*Id.*)[9] Others use their wives. Indeed, every Guardian admitted that he used a paid adult helper, a wife, or both. (A.24.)

For example, Tambah Leayon, Guardian of Appellants Saah and Tambah Jr., begins tapping at 6:30a.m. and finishes between 10:00 and 11:00a.m. (R.405-3 at 46:11-15, 47:5-16.) While his wife or a paid helper collects cuplump, he sits around "telling stories," "joking," "laughing" and having a "good time" until 12:30p.m., when it is time to collect latex. (*Id.* at 48:8-50:18, 51:13-52:3.) He finishes collecting latex by 2:00p.m., then returns to his home. (*Id.* at 52:10-53:8, 54:25-55:4; *see also* R.404 at 2 (while paid helpers collect cuplump, tappers "sit around" and "socialize," work in their gardens growing food or "take their own time and have a free body").) Tappers who use wives or paid adult helpers to collect cuplump and latex are finished working by 10:00a.m. (*Id.*)

---

[9] In 2007, for example, a tappers' base pay was $3.65 per day and his average take-home wage was $1559 per year. (R.144-10 ¶15.) By contrast, many Liberian government salaries were less than $1 a day, or $20 per month. (R.310 at 11.). The gross per capita income in Liberia was lower still, $167 per year in 2008 (up from $119 in 2000). *See* http://data.un.org/CountryProfile.aspx?crName=Liberia (last visited March 27, 2011).

So, even if tappers "needed" assistance, it does not mean (as Appellants contend, Op.Br.12) that Firestone intended the Guardians to force their Children to work, as opposed to using their wives or paid adult helpers.

### E.    Firestone Did Not Intend, But Rather Prohibited, The Use Of Children To Assist Tappers.

The undisputed evidence was that the Guardians could, and did, complete their duties without forcing their minor Children to work.  (R.209 at 13-15; R.404; A.24.)  Indeed, the Guardians themselves admitted that they completed their duties at times no Children were helping them.  (R.209 at 15-16.)

Indisputably, Firestone Liberia does not employ anyone under the age of 18; none of the Children were or could have been employees.  And since 2000—five years before this lawsuit was brought—it has prohibited employees from using minors as helpers:

- In June 2000, Firestone Liberia adopted a written policy prohibiting tappers from using anyone under 18 to assist them.  (R.144-1 ¶4, Exs. B, C.)

- In July 2005, Firestone Liberia reissued that policy and announced specific penalties.  (R.144-4, Ex. 4.)

- In November 2005, after the filing of this lawsuit claiming that the policy was being violated, Firestone Liberia issued a "zero tolerance" policy.  Under that policy, any person who participates in, induces, or fails to report child labor will be immediately terminated.  (R.144-4, Ex. 5.)

These policies barring child labor were disseminated down the chain of command and reported to the tappers' union for distribution to its members.  (R.494-8 at 152:19-154:16, 182:1-11.)  Firestone Liberia conducted annual

workshops from 2004 to 2008 to educate workers about its labor policies, including its policy against child labor. (R.144-8 ¶8; R.494-7 at 97:4-99:16, 100:13-102:18, 104:14-105:7, 174:4-175:12.) Each workshop was held at four locations around Firestone Liberia to facilitate attendance. (*Id.*) The complaint filed in this case in 2005 acknowledges Firestone Liberia's ban on child labor, showing that Appellants were aware of it. (R.2 ¶56.)[10]

These policies were and are enforced. Allegations of child labor are investigated, just as Firestone Liberia investigated Appellants' allegations in this case. (*Id.* ¶¶10, 13.)[11] Appellants cannot identify a single instance in which allegations brought to the attention of Firestone Liberia management were not addressed appropriately. (R.495-1 at 15; R.551 at 9.) At least 13 tappers were suspended for violating these policies before this lawsuit was filed. Eleven employees have been terminated since then. (R.144-8 ¶¶11-13, Exs. 6 & 7.)

---

[10] Appellants erroneously assert that "[e]very [G]uardian and Plaintiff" testified that they did not learn of the policy against child labor until after filing this suit in 2005. (Op.Br.5.) But they cite the testimony of only three Guardians. Several others admitted that they knew the policy years before filing suit. (R.144-16, Ex. 20 at 24:9-27:7; R.144-17, Ex. 40 (Interrogatory No. 14); R.551-2, Ex. 1 at 190:10-15.) Five Guardians who denied knowing about the policy were contradicted by their own children, who testified that they not only knew of the policy, but learned it from their Guardians. (R.144 at 18-19, 24-38.) *Indeed, two Guardians were disciplined for violating the no-child labor policy **before** this lawsuit was filed.* One denied being caught and suspended, despite being confronted with his signed suspension letter, witnessed by his Union Representative and his Superintendent. (R.144-17, Ex. 15 at 135:2-138:7; R.144-10 ¶8 & Ex. 2.) Another was told about the policy, later caught using child labor, and then suspended. (R.144-17, Ex. 25 at 108:22-109:13, 116:9-117:15.)

[11] Firestone Liberia found no support for the allegations of wrongdoing by certain headmen or other supervisors. (*See* R.144-8, Ex. 8.)

If minor Children were nonetheless working on the Firestone farm, and if any of that work was unsafe, those choices were made by their Guardians, not Firestone.  Indeed, various Children testified that they worked surreptitiously, knowing that Firestone prohibited it, and hid from Firestone Liberia managers to escape enforcement.  (R.144-16, Ex. 1 at 66:3-67:1, Ex. 6 (Interrogatory 12), Ex. 20 at 143:1-11, 168:11-21, 186:6-17; R.144-18, Ex. 67 at 237:5-25.)  The Guardians admitted that they, not Firestone, decided when their Children allegedly worked, and what work they allegedly did.  (R.209 at 16-18.)  As Guardian George Peter answered when asked who decided whether his wife or child would help him, and what work they would perform:  "[I]n my house, I do that."  (R.207-7 at 183:11-185:14; R.207-8 at 49:24-50:4, 56:12-16; R.207-10 at 49:2-50:24; R.144-18, Ex. 28 at 56:14-57:20.)

### F.    The District Court's Grant Of Summary Judgment To Firestone On Count II.

Firestone moved for summary judgment on Count II.  (R.209.)  In responding,  Appellants "failed to provide" the "Statement of Material Facts in Dispute" required by Local Rule 56.1(b).  (A.22.)  So while the court tried "to sort through the large evidentiary record" in adjudicating the motion, it was entitled to "assume that the facts as claimed and supported by admissible evidence by [Firestone] are admitted to exist without controversy[.]"  (*Id.* (citing L.R. 56.1(e).)  Thus, "[t]o the extent that [Appellants'] noncompliance with the Local Rules . . . obscured a dispute as to a material fact," the court ruled that such a dispute was "forfeited and cannot preclude summary judgment."  (*Id.*)

The court then granted Firestone's motion on multiple grounds. *First*, the court held, consistent with the Second Circuit's recent decision in *Kiobel*, 621 F.3d 111, that corporations are not proper defendants in ATS actions. (A.6-19.)

*Second*, the court held that even if corporations could be sued under the ATS, Appellants had not identified a relevant norm of CIL sufficiently specific or universal under *Sosa* to support a federal common law cause of action for "unsafe" child labor. (A.35.) All treaties that Appellants invoked other than Convention 182 were never even ratified by the United States. (A.27-28.) And "[i]t would be odd indeed if a United States court were to treat as universal and binding in other nations an international convention that the United States government has declined to ratify itself." (*Id.* (citation and quotes omitted).)

As to Convention 182, Article 3(d) defines the "worst forms of child labor" to include "work which, by its nature or the circumstances in which it is carried out, is likely to harm the health, safety or morals of children." (A.28.) The convention leaves that category "intentionally vague," recognizing that its content should be "determined by national laws or regulations or by the competent authority, after consultation with the organizations of employers and workers concerned." (A.28.) Indeed, the United States ratified Convention 182 on the understanding that it was non-self-executing. S. Treaty Doc. No. 106-5, 1999 WL 33292717 at *13.

*Third*, the court held that even "assum[ing] that there is some international consensus" as to the scope of "unsafe" child labor, the

undisputed facts entitled Firestone to summary judgment. To prevail, Appellants would need proof that Firestone "set up a quota system deliberately designed to cause Plaintiffs to perform work" that violates international law. (A.33.) But the evidence showed that the Guardians "set the hours [Children] work, what days they work, what work they perform, and the age at which [Children] first began working," and Appellants did not dispute that. (*Id.*) That rendered their claim doubly flawed. For one thing, every Guardian in this case admitted "that he had at least one adult to assist in the field, *i.e.*, one of his wives, a hired 'helper' or both." (*Id.*) Thus, to the extent Guardians used their Children as helpers, it was their decision, not Firestone's. For another thing, any consensus as to what kinds of child labor Article 3(d) prohibits "would be represented by the lowest common denominator among all laws promulgated to comply with Article 3(d)." (A.32-33.) Certainly, at least some of the work allegedly done by the Children (for example, washing cups) would not be universally condemned. (A.33.) So "not all of a tapper's work would qualify as" violating Article 3(d) "if performed by a child." (*Id.*)

Accordingly, since the undisputed facts showed that (1) the Guardians (not Firestone) decided whether their Children would work, and (2) the Guardians (not Firestone) "select[ed] which types of work [they] would assign their [C]hildren," the court held that Appellants "cannot establish that [Firestone] deliberately set up a system that would result in" violating Article 3(d). (*Id.*)

*Finally*, the Court held that because Appellants had failed to exhaust Liberian remedies, it would be inappropriate to create a federal common law cause of action. (A.36.) This appeal followed.

## SUMMARY OF ARGUMENT

The district court's order granting summary judgment to Firestone should be affirmed. *First*, corporations such as Firestone cannot be liable under the ATS. International law determines the scope of liability for ATS claims, including what the violation is and who can commit it. International law has uniformly and repeatedly rejected corporate liability for human rights violations. And even if domestic law governed who can be liable for an international law violation, the result would be the same.

*Second*, even if corporations could be liable under the ATS, there is no CIL norm that would support liability here. To begin with, the three treaty provisions on which Appellants' putative tort is based only impose obligations on sovereign States to create "programmes" aimed at ending unsafe child labor. They do not impose any legal duties on individuals or private entities, and therefore do not create the type of norm enforceable under the ATS. In addition, these treaties—two of which the United States has not ratified—do not create binding CIL norms. And the norm they purportedly create—which Appellants define as prohibiting any work that is "likely to harm the health, safety, physical or mental, spiritual, moral or social development" of anyone under 18—on its face fails *Sosa*'s demanding standard of definition. Finally, if a sufficiently defined CIL norm existed, it would be inappropriate to create a

federal common law cause of action to enforce it where adequate Liberian remedies already exist, and where Congress ratified the treaty creating it on the express understanding that it would be non-self-executing, thereby declining to give federal courts authority to enforce the norm.

*Third*, if an actionable norm against "unsafe" child labor existed, summary judgment was still appropriate. The district court found that any actionable norm for unsafe child labor would require, at the very least, proof that Firestone set up a quota system deliberately designed to cause children to perform work prohibited by international law. Appellants do not challenge this formulation. The undisputed evidence establishes that the Guardians decided whether the Children would work, when they would work, and what work they would do. Appellants identified no evidence that Firestone required the Children to work. On the contrary, Firestone's express written policies prohibit child labor.

*Fourth*, Appellants failed to exhaust their Liberian remedies.

*Fifth*, the ATS does not extend to conduct in a foreign sovereign's territory.

*Sixth*, at the very least, the liability period for any unsafe child labor claim would begin only after ILO Convention 182 came into force in Liberia in 2004.

*Finally*, the district court properly exercised its discretion in denying Appellants' motion to amend to add Liberian law claims. Had they been added, the district court would have declined supplemental jurisdiction over these

Liberian law claims because they raised complex issues of foreign law that would be inefficient and impracticable for a United States court to decide. Moreover, Appellants' motion, filed more than three years into the litigation on the day Firestone filed its motion for summary judgment, was untimely.

The judgment of the district court should be affirmed.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008).

Determinations as to whether to exercise supplemental jurisdiction under § 1367(c), and whether to grant leave to amend a complaint, are reviewed only for abuse of discretion. *Dargis v. Sheahan*, 526 F.3d 981, 990 (7th Cir. 2008); *Stayart v. Yahoo! Inc.*, 623 F.3d 436, 439 (7th Cir. 2010).

## ARGUMENT

## I.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO FIRESTONE ON COUNT II.

### A.   The District Court Correctly Held That Corporations Cannot Be Sued Under The ATS.

The Second Circuit, the only Court of Appeals to substantively address the question, held that corporations cannot be sued under the ATS because (1) international law determines "whether a particular class of defendant, such as corporations, can be liable under the [ATS]," and (2) "corporate liability for violations of customary international law has not achieved universal recognition or acceptance as a norm in the relations of States with each other."

*Kiobel*, 621 F.3d at 149.  The district court was correct to follow this well-

reasoned precedent.  (A.11-12.)[12]

### 1.    International Law Determines Who Can Be An ATS Defendant.

The district court correctly held that international law, not domestic tort

law, supplies the elements of a claim under the ATS—including who can be

liable.  (A.12-13.)  The Supreme Court made clear that one factor in

determining whether a norm is established under the ATS is "whether

*international law* extends the scope of liability for a violation of a given norm to

the perpetrator being sued, if the defendant is a private actor such as a

corporation or individual."  (*Id.* (quoting *Sosa*, 542 U.S. at 732 n.20).)  Every

court to address the issue after *Sosa* agrees.  *See Kiobel*, 621 F.3d at 127-131;

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 258 (2d

Cir. 2009); *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 244, 269-70 (2d Cir.

2007) (Katzmann, J., concurring); *Doe v. Nestle, S.A.*, No. 99-02506, 2010 WL

3969615,  at *14 (C.D. Cal. Sept. 8, 2010); *Abecassis v. Wyatt*, 704 F. Supp. 2d

623, 653-54 (S.D. Tex. 2010); *Bowoto v. Chevron Corp.*, 2006 WL 2455752, at

*7 (N.D. Cal. Aug. 22, 2006), *reh'g granted on other grounds*, 2007 WL 2349341

(Aug. 14, 2007).

---

[12] The district court here properly held that the absence of corporate liability under CIL means "that Plaintiffs have failed to establish a legally cognizable claim."  (A.9, A.17); *but see Kiobel*, 621 F.3d at 118, 120 (discussing this issue as jurisdictional).  If the issue truly were jurisdictional, this Court would have to dismiss the case on this ground without reaching the other issues presented.  *See, e.g.*, *Buchel-Ruegsegger v. Buchel*, 576 F.3d 451, 453 (7th Cir. 2009).

Appellants erroneously argue that, because ATS claims are created by federal common law, domestic tort law "supplies the contours of an ATS" action.  (Op.Br.24.)  *Sosa* says the opposite, holding that while ATS claims are "*recognized* at common law," they are "*defined* by the law of nations."  542 U.S. at 712 (emphasis added); *see also id.* at 721 ("the ATS was meant to underwrite litigation of a narrow set of common law actions derived from the law of nations").  International law thus determines not just the elements of the tort, but to whom it may be applied.  *Id.* at 732 n.20; *see also id.* at 760 (Breyer, J., concurring) ("to qualify for recognition under the ATS a norm of international law . . . must extend liability to the type of perpetrator (*e.g.*, a private actor) the plaintiff seeks to sue").

This makes sense.  "[T]he purpose of the ATS was not to encourage United States courts to create new norms of international law unilaterally." *Kiobel*, 621 F.3d at 140 (citing *Sosa*).  On the contrary, "[u]nilaterally recognizing new norms of [CIL] . . . would potentially create friction in our relations with foreign nations and, therefore, would contravene the international comity the statute was enacted to promote."  *Id.* at 140-141.

Besides, even if domestic common law could determine who can violate a CIL norm for purposes of the ATS, the result would be no different.   Courts creating federal common law "look for legislative guidance before exercising innovative authority over substantive law."  *Sosa*, 542 U.S. at 726.  Where the ATS is concerned, courts should "welcome any congressional guidance in exercising jurisdiction with such obvious potential to affect foreign relations."

*Id.* at 731.  Congress provided such guidance when it enacted the Torture Victims Protection Act ("TVPA") to codify two ATS claims.  *See* S. Rep. 102-249, 1991 WL 258662, at *4.  Congress deliberately rejected corporate liability:  "The House Foreign Affairs Committee amended the bill to substitute 'individual' for 'person' in order to 'make it clear they were applying the Act to individuals and not to corporations.'"  *Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1127 (9th Cir. 2010) (quoting The Torture Victim Protection Act:  Hearing and Markup before the H. Comm. on Foreign Affairs on H.R. 1417, 100th Cong. 82, 85 (1988)).[13] Courts should follow that deliberate Congressional policy judgment, not subvert it by engrafting conflicting common law rules.  *Cf. Enaharo v. Abubakar*, 408 F.3d 877, 884-886 (7th Cir. 2005) (noting that it is "hard to imagine that the *Sosa* Court would approve of common law [ATS] claims . . . when Congress has specifically provided a cause of action for those violations and has set out how those claims must proceed").

The Supreme Court's *Bivens* jurisprudence—which "provides perhaps the closest analogy" to claims under the ATS, *Sosa*, 542 U.S. at 743 (Scalia, J., dissenting)—also counsels against creating corporate liability.  In *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 71 (2001), the Court declined to extend

---

[13] Appellants rely on the contrary ruling by *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008).  (Op.Br.33.)  *Romero* erroneously ruled, without explanation, that *Aldana v. Del Monte Fresh Produce, Inc.*, 416 F.3d 1242 (11th Cir. 2005) (per curiam) established corporate liability under the ATS and TVPA.  But *Aldana* does not even discuss corporate liability, and thus is not a reasoned holding by the Eleventh Circuit on the issue.  *Bowoto*, 621 F.3d at 1126 ("It does not appear the defendants in [*Aldana*] ever challenged the notion of corporate liability, however, and the Eleventh Circuit did not explain its reasoning on the issue [in *Romero*].").

*Bivens* liability to corporations. The Court observed that, if given the choice, plaintiffs would sue corporations rather than the individuals responsible for an alleged violation. That, in turn, would undermine *Bivens*' purpose of deterring individuals' wrongful conduct. *Id.* The same reasoning applies under the ATS. *The Nurnberg Trial (United States v. Goering)*, 6 F.R.D. 69, 110 (Int'l Military Trib. at Nuremberg 1946) ("Crimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced.").[14]

### 2.    Corporate Liability Is Not A CIL Norm.

After exhaustive analysis, *Kiobel* concluded that "[n]o corporation has ever been subject to *any* form of liability (whether civil, criminal, or otherwise) under the [CIL] of human rights." 621 F.3d at 148. "Rather, sources of [CIL] have, on several occasions, explicitly rejected the idea of corporate liability." *Id.* This precludes corporate ATS liability.

Appellants' criticisms of *Kiobel* miss the mark. They assert that the Allied Powers held German corporations liable for international law violations using mechanisms other than the Nuremberg Tribunal. (Op.Br.31-32.) But the cited materials do not support the point. The Report of the Crimea Conference, U.S.-U.S.S.R.-U.K. (Feb. 11, 1945), does not even mention claims

---

[14] The issue is not, as Appellants suggest (Op.Br.33), whether the TVPA or *Bivens* "narrow[s]" the ATS. For a claim under the ATS to exist, it first must be "creat[ed]" by a federal court as an exercise of "residual common law discretion." *Sosa*, 542 U.S. at 738. The question is whether, where Congress and the Supreme Court have declined to create a federal cause of action against corporations in analogous circumstances, courts should do so under the ATS.

against corporations for violations of international law.  Similarly, Allied Control Council Law No. 9 dismantled IG Farben not to punish or remedy a violation of international law, but to dismantle Germany's war machinery "to insure that Germany will never again threaten her neighbors or the peace of the world."  *See* Control Council Law No. 9 (Nov. 30, 1945) (*available at* http://www.loc.gov/rr/frd/Military_Law/Enactments/01LAW06.pdf).[15]

Appellants miss the more telling point: while the Nuremberg Judgment held that individuals could be directly liable for certain international law violations, it excluded corporations from such liability.  *Kiobel*, 621 F.3d at 132-36.  Many companies were complicit in the Nazi atrocities and individuals connected with those atrocities were held personally responsible.  Matthew Lippman, *War Crimes Trials of German Industrialists: The "Other Schindlers"*, 9 Temp. Int'l & Comp. J. 173 (1995).  But the corporations were not held liable under international law or dismantled by Control Council decree.  Indeed, many of them still exist, such as Krupp (now ThyssenKrupp) and Siemens.

Every other international tribunal convened in the ensuing 65 years has followed the Nuremberg Tribunal in eschewing corporate liability, including, most recently, the International Criminal Court.  *Kiobel*, 621 F.3d at 136-37.[16]

---

[15] Contrary to *amici* Nuremberg Scholars' unsupported assertion (p.8-11), when the Allied Control Council issued decrees—such as those dissolving IG Farben and the Nazi Party—it was not purporting to exercise any international law power.  Rather, the Control Council decrees were issued pursuant to the sovereign authority of the German state, which the Allies assumed when the government of Germany temporarily ceased to exist.  *See* Control Council Law Proclamation No. 1.

[16] Appellants erroneously argue that the rejection of corporate liability by international criminal tribunals is irrelevant because tort law serves purposes

Similarly, when States have negotiated multilateral treaties directly imposing liability under international human rights law, they have imposed liability only on individuals, not corporations. *See, e.g.,* Genocide Convention, Art. 1 ("Persons committing genocide or any of the other acts enumerated in article III shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals.").[17]

Appellants assert, contrary to *Kiobel*, that "corporate liability is an established concept under international law." (Op.Br.26.) But they identify no

---

(continued…)

of compensation in addition to deterrence and punishment. (Op.Br.30.) But the delegates drafting the Rome Statute of the International Criminal Court considered corporate liability for restitution and compensation and rejected it because allowing corporate liability would detract from international law's focus "which is on individuals," and because "there are not yet universally recognized common standards for corporate liability." *See* Kai Ambos, Article 25 ("Individual criminal responsibility"), in <u>Commentary on the Rome Statute of the International Criminal Court: Observer's Notes, Article by Article</u> 747 ¶4 (Otto Trifferer ed., 2d ed. Supp. 2008). *Amici* International Law Professors erroneously assert (p.4) that the Rome Statute's rejection of corporate liability should not be interpreted as evidence against such liability. They cite Article 10 of the Statute, which provides that "[n]othing in *this Part* shall be interpreted as limiting or prejudicing in any way existing or developing rules of international law." (emphasis added). But Article 10 appears in and refers to Part 1 of the Statute. Article 25, which limits liability to natural persons, appears in Part 3.

[17] *Amici* International Law Scholars (p.13-14) cite eight treaties on diverse subject matters—ranging from preventing terrorism to hazardous waste disposal—as evidence that corporations "can be held liable for violations of international law." As *Kiobel* held, however, "the fact that those treaties impose obligations on corporations in the context of the treaties' particular subject matter tells us nothing about whether corporate liability for, say violations of *human rights*, which are not a subject of those treaties, is universally recognized as a norm of [CIL]." 621 F.3d at 138. On the contrary, these treaties show that States know how to create corporate liability when they want to.

instance of such liability.  The United Nations resolution and committee comment stating that States should provide remedies under domestic law for human rights violations by "entities" (Op.Br.27) are advisory, non-binding documents, which are of "'little utility' in discerning norms of [CIL]." *Kiobel*, 621 F.3d at 131 (quoting *Sosa*, 542 U.S. at 734).  Besides, they speak to State obligations, not restrictions on individual (or corporate) conduct.  And they confirm that a State's duty to provide remedies applies only to conduct within its own territorial jurisdiction.  *See* U.N. Comm. on Human Rights [UNHCR], Gen. Cmt. No. 31 ¶¶3, 10.[18]  Appellants also cite the Convention on the Elimination of All Forms of Racial Discrimination, but Article 6 of that Convention expressly limits a State's obligation to provide a remedy to violations occurring in its territory.

Appellants parrot the views of Judge Leval (who disagreed with the *Kiobel* majority), asserting that although American courts are free to choose how to enforce their "legal obligations," if a State fails to impose corporate liability under the ATS, it would "likely breach" its "international obligations to protect human rights." (Op.Br.27); 621 F.3d at 172 & n.30 (Leval, J., concurring).  But the United States has no legal obligation to provide a remedy for an alleged violation of individual rights in a foreign nation's territory.  Instead,

---

[18] *See also* Report of the Special Representative of the Secretary-General (SRSG) on the issue of human rights and transnational corporations and other business enterprises ("SRSG Report"), A/HRF/4/035 (9 February 2007) ¶10 & n.5 ("international law firmly establishes that states have a duty to protect against nonstate human rights abuses within their jurisdiction, and that this duty extends to protection against abuses by business entities," but this duty does not apply in territory beyond a State's "power or effective control").

international law "generally leaves it to the States parties concerned to choose their method of implementation in their territories." U.N. Human Rights Comm., General Comment No. 3. If a foreign ambassador is attacked in New York, the United States may decide whom to hold liable to vindicate its international obligation to protect ambassadors. But if that ambassador is attacked in Paris, it is up to France to make such decisions. That the attack violated one State's international obligations does not mean that every other State can decide on whom to impose liability.

Finally, Appellants (Op.Br.25) and *amici* International Law Scholars (p.16) incorrectly assert that federal courts should create a new international norm of corporate liability out of "general principles" of law. But the ATS provides jurisdiction only over universally recognized violations of international law. It does not give federal courts "power to mold substantive law." *Sosa*, 542 U.S. at 713; *Nestle*, 2010 WL 3969615, at *74 n.70 (*Sosa* does not allow courts to fashion rules of international corporate liability out of "general principles" of law). Moreover, Appellants have utterly failed to show that any such "general principles" of corporate liability for international law violations exist. On the contrary, "[a]t national levels, there is enormous diversity in the scope and content of corporate legal responsibilities regarding human rights."[19] And even if some "general principle" existed "at a high level of generality" (*Sosa*, 542 U.S. 736 n.27), there is "significant national variation in modes of attributing

---

[19] SRSG Report, U.N. Doc. A/HRC/4/035 (Feb. 9, 2007) ¶¶28, 29, 34.

corporate liability," and "[t]here are also national differences in attributing liability within transnational corporate structures." *Id.*[20]

In short, as the United Nations Special Representative on the Issue of Human Rights and Transnational Corporations and other Business Enterprises concluded in his 2007 report: "[I]t does not seem that the international human rights instruments discussed here currently impose direct legal responsibilities on corporations" because "states have been unwilling to adopt binding international human rights standards for corporations."[21] Nor has any norm of corporate liability emerged under CIL.[22]

---

[20] Besides, extending international law obligations to corporations is not a procedural issue that properly can be addressed through "general principles" of law. *See* Restatement (Third) Foreign Relations §102 cmt. l (examples of rules drawn from general principles are "the passage of time as a defense," "that no one may be judge in his own cause; res judicata; and rules of fair procedure generally").

[21] SRSG, U.N. Doc. A/HRC/4/035 (Feb. 9, 2007) ¶44.

[22] *Id.* at ¶34. Appellants cite the Special Representative's April 2008 report as authority for a "corporate responsibility to respect human rights." (Op.Br.27-28 (citing *Report of the Special Representative of the Secretary-General (SRSG) on the issue of human rights and transnational corporations and other business entities*, U.N. Doc. A/HRC/8/5 (Apr. 7, 2008) ¶¶73-74).) But that report does not purport to set forth binding rules of international law. The Special Representative's mandate directed him to both "identify and clarify" current international law, and to "submit his 'views and recommendations'" regarding the future development of international law. U.N. Doc. A/HRC/4/035, at ¶5. The 2007 report quoted in the text responds to the first mandate. *Id.* The 2008 report, on which plaintiffs rely, responds to the second. *See* U.N. Doc. A/HRC/8/5 ¶5. It is the former, not the latter, that is a proper source of international law. *See Sosa*, 542 U.S. at 734 (courts may look to "the works of jurists and commentators . . . not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.") (quoting *The Paquette Habana*, 175 U.S. 677, 700 (1900).)

### 3.    Appellants' Remaining Contentions Are Meritless.

Appellants  erroneously assert that *Kiobel* goes against "overwhelming authority." (Op.Br.21-22.)  But the cases cited either say nothing about the issue,[23] expressly leave it undecided,[24] or merely assume that corporate liability exists.[25]  Decisions do not establish precedent on these types of implicit "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon."  *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (cite and quotes omitted); *Glidden v. Chromallay Am. Grp.*, 808 F.2d 621, 625 (7th Cir. 1986).

Appellants are wrong to suggest that *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428 (1989) or *Barrow Steamship Co. v. Kane*, 170 U.S. 100, 106 (1898) resolves the issue.  In *Amerada Hess*, responding to the argument that the ATS does not exempt States, the Court merely noted that the ATS says nothing one way or the other about the types of defendants over whom it provides jurisdiction.  488 U.S. at 438.  Similarly, *Barrow*'s statement that the term "aliens" traditionally includes foreign corporations is irrelevant. The term "aliens" defines who can *file suit* under the ATS, not who can *be sued*. The ATS says nothing about the latter.

---

[23] *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 91-92 (2d Cir. 2000); *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163 (2d Cir. 2009).

[24] *See Presbyterian Church*, 582 F.3d at 261 n.12; *Khulumani*, 504 F.3d at 282 (2d Cir. 2007) (Katzmann, J., concurring).

[25] *Romero*, 552 F.3d at 1315.

**B.    The District Court Correctly Concluded That There Is No Universally Recognized, Specifically Defined Norm Against The Alleged "Unsafe" Labor Performed By The Children That Would Support Creation Of A Federal Common Law Cause Of Action.**

If corporations could in theory be liable under the ATS, there is no norm of international law applicable here.  *Sosa* fundamentally reoriented ATS analysis.  Overruling 20 years of lower court decisions assuming that the ATS creates a statutory cause of action, *see, e.g., Hilao v. Estate of Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994), *Sosa* made clear that the ATS merely gave federal courts jurisdiction to create, as a matter of federal common law, "a cause of action for" a "modest number of international law violations[.]"  542 U.S. at 724.  This case is not one of them.

To be enforceable under the ATS, an international norm must satisfy four requirements.  *First*, it must be the right kind of norm.  When the ATS was enacted, while international law applied predominantly to States, *Sosa*, 542 U.S. at 714-15, it also included a "narrow set" of "hybrid" rules "binding individuals" but "overlap[ping] with the norms of state relationships."  *Id.*  Only norms within this "narrow set" can support an ATS claim.  *Id.*  *Second* and *third*, *Sosa* made clear that a CIL norm must be both *universally* recognized and defined with a high degree of *specificity* to "raise even the possibility of a private cause of action."  542 U.S. at 732, 738 n.30.  *Finally*, recognizing a cause of action to enforce the norm must be an appropriate exercise of discretion.  *Id.* at 732-33 (whether to recognize a cause of action "should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in federal courts");

*Khulumani*, 504 F.3d at 269 (Katzmann, J., concurring) ("A federal court is free, in the exercise of its common-law discretion, to decline to provide a cause of action for a violation of international law."). The norm advanced here fails all four inquiries.

### 1.     If Any CIL Norm Exists, It Imposes Obligations Only On States.

Appellants claim a violation of a purported CIL norm created by (1) Article 3(1) of ILO Convention 138 on the Minimum Age for Employment, 1015 U.N.T.S. 297 (*entered into force* June 19, 1976), (2) Article 3(d) of ILO Convention 182 on the Worst Forms of Child Labour, 2133 U.N.T.S. 161 (*entered into force* Nov. 19, 2000), and (3) Article 32 of the Convention on the Rights of the Child ("CRC"), 1577 U.N.T.S. 3 (*entered into force* Nov. 2, 1990). (Op.Br.38-40). But by their terms, these conventions only impose legal obligations on States to define prohibited labor within their territories and "design and implement programmes of action to eliminate" such labor. Convention 182, Arts. 1 & 4-7; Convention 138, Arts. 1, 3(2) & 9; CRC, Art. 32. They impose no obligations on individuals or private entities. They are thus not enforceable under the ATS, which is limited to "the modest number of international law violations with a potential for *personal liability*." *Sosa*, 542 U.S. at 724 (emphasis added).

### 2.     Appellants Have Failed To Show A Universally Accepted CIL Norm.

Appellants' proffered norm also fails *Sosa*'s universality prong. CIL "results from a general and consistent practice of states followed by them from

a sense of legal obligation."  Restatement (Third) of Foreign Relations § 102(2).
It is not created, as Appellants suggest, by some abstract "consensus"—and
certainly not by law professors.  (Op.Br.28, 35, 37-42, 47-48.)  The subjective
views of States (*opinio juris*) are relevant only to the extent they explain the
motive for State practice, *i.e.*, that the conduct of States arises not from
national preferences or policy decisions, but from a "sense of legal obligation."
Restatement (Third) of Foreign Relations § 102 cmt. c; *Flores v. So. Peru Copper
Corp.*, 414 F.3d 233, 250 (2d Cir. 2003) ("[T]he usage and practice of States—as
opposed to judicial decisions or the works of scholars—constitute the primary
sources of [CIL].").

Appellants rely principally on the three treaties discussed above.  But
treaty obligations do not become CIL unless "an overwhelming majority of
States have ratified the treaty, *and* those States uniformly and consistently act
in accordance with its principles."  *Flores*, 414 F.3d at 256 (emphasis in
original); *see also North Sea Continental Shelf*, 1969 I.C.J. 3 ¶74 (for a norm
created by a treaty to become part of CIL, "an indispensable requirement" is
that State practice "should have been both extensive and virtually uniform in
the sense of the provision invoked").[26]  This is a central tenet of international
law, with important ramifications.  Were the law otherwise, judges around the

---

[26] Appellants invoke ILO Recommendation 190. (Op.Br.40.)  But ILO
recommendations do not create, evidence, or embody binding norms.  *See* ILO
Constitution Art. 19(d).  Appellants also cite a statement in a 1997 State
Department report that certain workers rights are "core labor standards"
(Op.Br.38), but that does not improve their claim.  Calling principles "core
standards" does not make them binding CIL.  And besides, international law is
not created by State Department reports.

world could overrule the United States' refusal to ratify treaties like the Statute of the International Criminal Court.

Appellants' three treaties do not meet those criteria.  Appellants have not identified any State practice—much less general and consistent State practice—establishing a norm against "unsafe" child labor.  The United States did not ratify the CRC.  Neither the United States nor Liberia ratified Convention 138.  And while the United States ratified Convention 182, it did so on the understanding that it was not self-executing.[27]

### 3.     The Norm Against Hazardous Child Labor Does Not Meet *Sosa*'s Stringent Standard of Specific Definition.

Appellants' norm also fails *Sosa*'s specificity prong.  Parroting the CRC, Appellants contend that CIL prohibits work by a minor that "by its nature or the circumstances in which it is carried out, is hazardous or is likely to harm the health, safety, physical or mental, spiritual, moral or social development of children."  (Op.Br.41.)  On its face, this does not come close to *Sosa*'s "demanding standard of definition."  542 U.S. at 738 n.30.  The conventions Appellants invoke did not even attempt any specific definition.  Instead, they

---

[27] Report of the Tripartite Advisory Panel on International Labor Standards to the President's Committee on the International Labor Organization Regarding Convention No. 182 on the Worst Forms of Child Labor ("TAPILS Report"), S. Treaty Doc. 106-5 (1999), 1999 WL 33292717, at *38.  This Report is the authoritative U.S. interpretation of Convention 182, transmitted by the President to the Senate with his request for ratification.  *Id.*  The Senate ratified Convention 182 on the condition that it must be interpreted in accordance with "the authoritative representations which were provided by the President and his representatives to the Senate and its Committees in seeking Senate consent to ratification."  145 Cong. Rec. S14226-03 (1999), 1999 WL 1003553 (incorporating principles of treaty interpretation set forth in Condition (1) of the ratification of the INF treaty, 134 Cong. Rec. S6876-01 (1998), 1988 WL 1091277).

explicitly left each signatory country to decide what labor practices to prohibit within its own territory, and what penalties to impose:

- After providing in Article 3(1) that States Parties should not allow persons under 18 to engage in work which is "likely to jeopardise the[ir] health, safety or morals," Convention 138 states in Article 3(2) that "[t]he types of employment or work to which paragraph 1 of this Article applies shall be determined by national laws or regulations."

- Convention 182 is substantially identical. Article 3(d) defines the "worst forms of child labor" to include work that is "likely to harm the health, safety or morals of children"; Article 4(1) states that "[t]he types of work referred to under Article 3(d) shall be determined by national laws or regulations."

- In accord, the CRC states in Article 32 that its prohibition on work that is "likely to be hazardous or to interfere with the child's education, or to be harmful to the child's health or physical, mental, spiritual, moral or social development" is to be implemented through national laws establishing a minimum age for employment and "appropriate regulation of hours and conditions of employment."

Indeed, the United States' authoritative interpretation of Convention 182 recognized that Article 3(d) is "a 'discretionary provision' because 'there is no obligatory minimum list [of the types of hazardous work] under the Convention.'" *TAPILS Reports*, 1999 WL 33292717, at *38.

The ILO agreed, observing that in Convention 138, "Article 3 leaves to the individual countries both the content and the method of determining the types of work or employment." International Labour Office, Report IV (2A) Child Labour, 87th Session (June 1999).[28] And Article 3(d) of Convention 182 is "a discretionary provision, leaving it to the competent authority to determine the type of work[.]" *Id.*

_____

[28] Available at http://www.ilo.org/public/english/standards/relm/ilc/ilc87/rep-iv2a.htm (last visited March 26, 2011).

Appellants did not define the elements of the universal "unsafe" child labor tort they advance—either below or in their opening brief here.  As to what kind of work is allegedly prohibited, Appellants "threw up their hands."  (A.35.) They proposed to let a jury decide what international law prohibits, guided only by five nonexclusive "considerations"—which were themselves drawn from an ILO recommendation, which is expressly non-binding, and which the United States has stated that countries are "not required to ratify or comply with." (*See* R.581 at 2-3; Op.Br.41); *TAPILS Report*, 1999 WL 33292717, at *38.  As to what role Firestone's conduct must have played in any such work, Appellants' proposed jury instruction said nothing, implying that the jury could hold Firestone strictly liable if any Appellant engaged in "unsafe" work even if prohibited by Firestone and surreptitiously requested by a Guardian.  (R.581.)

The consequences of letting juries apply such an ambiguous standard would be remarkable, and breathtaking in scope.  It would permit United States juries to make universally applicable policy decisions about the scope of permissible child labor that the CRC and Conventions 138 and 182 expressly leave to individual countries with respect to conduct within their borders. According to the ILO, 126 million minors worldwide engage in what the ILO considers "unsafe" labor every day.  *The End of Child Labour Within Reach* at 5 (Int'l Labour Org. 2005).[29]  Indeed, the scope of this standardless "unsafe" child labor is so broad that Appellants' counsel admitted that it would impose

---

[29] Available at http://www.ilo.org/public/english/standards/relm/ilc/ilc95/pdf/rep-i-b.pdf (last visited March 26, 2011).

liability for work that "children on Indiana farms do . . . every day." (R.590 at 51.)

It is no answer to argue, as Appellants do, that "'categorical specificity' is not required when allegations fall within a universally agreed core of prohibited conduct. (Op.Br.42.) Some courts have agreed with this fuzzy approach, albeit not for child labor. *Compare Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1093 (N.D. Cal. 2008) (recognizing that the norm against "cruel, inhuman and degrading treatment" ("CIDT") has no defined elements, but permitting claim because allegations were sufficiently egregious) *with Forti v. Suarez-Mason*, 694 F. Supp. 707, 712 (N.D. Cal. 1988) (rejecting CIDT as a basis for an ATS claim because it has no defined elements). But this divergence does not matter here, where there is no agreed core—*i.e.*, "no obligatory minimum list"—of prohibited hazardous labor and thus no way to instruct the jury.

### 4. Even If A *Sosa*-Compliant "Unsafe" Child Labor Norm Existed, It Would Not Be An Appropriate Exercise Of Discretion To Create A Cause Of Action To Enforce It.

If Appellants' "unsafe" child labor norm were sufficiently universal and specific and applied to Firestone, federal courts should nonetheless decline to exercise their discretion to enforce it.

*First*, Congress refused to ratify Convention 138 and the CRC, and ratified Convention 182 on the condition that it would be non-self executing, and "would not be enforceable as a matter of United States law in United States courts." *TAPILS Report*, 1999 WL 33292717 at *13. Appellants' suggestion that a non-self-executing treaty can evidence "international consensus"

(Op.Br.47) misses the point.  Federal courts cannot enforce a norm where Congress "expressly declined to give the federal courts the task of interpreting and applying" the treaty that created it.  *Sosa*, 542 U.S. at 728.

*Second*, adequate Liberian remedies exist.  Like the United States, Liberia addresses unlawful child labor principally through public actions for civil penalties.  (R.580-3.)  Liberia also has a tort law system that Appellants claim provides four causes of action based on their allegations.  (R.206.) Appellants do not contend that these remedies are inadequate.  The *Sosa* Court declined to permit an arbitrary detention claim in part because doing so would supplant existing statutory and common law remedies.  542 U.S. at 736-37. Similarly, *Bivens* actions are not permitted where there are available state tort law remedies.  *Holly v. Scott*, 434 F.3d 287, 294 (4th Cir. 2006); *Alba v. Montford*, 517 F.3d 1249, 1254 (11th Cir. 2008); *Peoples v. CCA Det. Ctrs.*, 422 F.3d 1090 (10th Cir. 2005).[30]  The result here should be no different.

Appellants' responses again miss the point.  They argue, based on *Wiwa*, 226 F.3d at 105-106, that the ATS reflects a Congressional policy to develop federal common law remedies for violations of international law committed in foreign countries.  (Op.Br.61-62.)  But the quoted passage refers to the TVPA,

---

[30] *But see Pollard v. GEO Group, Inc.*, 607 F.3d 583, 596-97 (9th Cir. 2010) (only a preexisting federal remedy will bar the creation of new Bivens claims).  *Pollard* is wrongly decided and distinguishable.  It held that state law remedies are not a reason to refrain from creating a *Bivens* cause of action because there is an overriding federal interest in providing uniform rules for constitutional torts by federal employees.  But there is no overriding federal interest in providing tort claims for Liberian labor practices.  To the contrary, creating such claims would undermine uniformity, not promote it.  If the United States can create remedies for unsafe labor in foreign countries, so too can every other State.

not the ATS.  *Sosa* expressly rejected the suggestion that the TVPA is a Congressional mandate for courts to develop new law under the ATS.  542 U.S. at 728.  Appellants further err in suggesting that the rule that federal courts create common law only when necessary to vindicate federal interests is unique to *Bivens*.  (Op.Br.60-61.)  It is a general feature of post-*Erie* federal common law.  *See, e.g., Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 579 (7th Cir. 2007).

### C.  If An International Norm Prohibited Alleged "Unsafe" Child Labor, The Undisputed Evidence Entitled Firestone To Summary Judgment.

If corporations could be liable under the ATS, and a definite and universal CIL norm applied here, Firestone was still entitled to summary judgment.  At its core, Appellants' claim is that the Guardians needed their Children's help on the rubber farm because the Guardians had too much work to do alone.  But Appellants never explain how United States courts can distinguish between these Children and, to take one example, the thousands of children who legally work on their parents' farms in Indiana.  The district court identified this fundamental gap in Appellants' case:  "Plaintiffs ask the Court to label every Indiana farmer who has a minor perform any hazardous work an enemy of all mankind . . . even though such work may be fully compliant with United States labor law."  (A.32.)  Absent any workable distinction—and Appellants continue to provide none—reversing the district court would drag the federal courts into drafting global policy on child labor for everything from

Indiana family farms, to French wineries, to Brazilian coffee farms, to Vietnamese rice paddies.

Despite requests from Firestone and the district court, Appellants never specified what conduct by Firestone Liberia (or Firestone) would actually violate international law. (A.35; R.209 at 41-42; R.310 at 16 & n.15.) Faced with this lacuna in Appellants' theory, the district court held that showing Firestone violated international norms would require—at the least—proof that Firestone "set up a quota system deliberately designed to cause [the Children] to perform work" prohibited by international law. (A.30.) Appellants do not challenge this formulation on appeal. The undisputed evidence defeats their claim.

Appellants never claim that Firestone forced children to work or selected the tasks for children who supposedly worked. Rather, the evidence shows— and Appellants do not dispute—that the Guardians "set the hours [Children] work, what days they work, what work they perform, and the age at which [Children] first began working." (A.24.) Because the Guardians (not Firestone) decided whether their Children would work, and the Guardians (not Firestone) "select[ed] which types of work [they] would assign their [C]hildren," Appellants "cannot establish that [Firestone] deliberately set up a system that would result in" a violation of the claimed international tort. (A.32-33.)

Appellants' responses again are off-point. *First*, they complain that the district court found that tappers can complete their duties without assistance, then argue that conflicting evidence existed on this issue. (Op.Br.51-52.) In fact, the district court "assume[d] that the quotas are too high for a tapper to

receive full pay without assistance." (A.24.) It nonetheless found that Appellants failed to create a triable issue, not because tappers can do their jobs alone (though they can), but because Appellants submitted no evidence that tappers needed to use their children (as opposed to adults) as helpers. (A.24 (Firestone "has asserted, and Plaintiffs haven't denied, that every father in this case admits that he had at least one adult to assist in the field—*i.e.*, one of his wives, a hired 'helper' or both.").)[31] Indeed, as set out above, tappers could hire *two* adult helpers and still earn a wage *three times* that of a Liberian civil servant. With this evidence, no basis exists to "infer" that the Children had to work.

Relatedly, Appellants assert that "many fathers" used their children as helpers because they "could not afford adult helpers." (Op.Br.51.) Again, the evidence they cite does not support that assertion. One child's statement that he helped his father "because that is our livelihood" does not establish that his father could not afford adult assistants. And in the other cited excerpt, the Guardian hired an adult assistant. (R.230-10, Ex. 4 at 37:20.)

*Second*, Appellants have no evidence to dispute that the Guardians chose what duties their Children performed. Appellants argue only that Firestone Liberia determined the Guardians' job duties and set the time at which the Guardians began work. (Op.Br.50-51.) But evidence that tappers begin work

---

[31] *See also* R.551-3, Ex. 2 (John Flomo Dep. 127:15-141:24) (has been hiring a paid helper since he began work in Division 38), *id.* at 21:24-22:2 (began in Division 38 in 2000); R.551-4, Ex. 3 (Tambah Leayon Sr. Dep. 23:12-16) (has had paid helpers since the Liberian civil war), *id.* at 25:3-17 (always employs two helpers), *id.* at 26:10-25, 28:2-12 (has being paying helpers since 1992).

early in the morning or work long hours does not establish that Firestone Liberia required them to make their children do the same.

Appellants' assertions that some Firestone Liberia field personnel (*i.e.* headmen, overseers and superintendents) "wanted" child labor to occur (Op.Br.52-53.) are beside the point. If true, it would not establish that Firestone Liberia "deliberately set up a system that would result in worst forms of child labor, whatever that term may mean." (A.33.) Appellants failed to present evidence that *any* of the work would be universally condemned, as required to support ATS liability, and the district court correctly found that at least some of it (for example, washing cups) would not. (A.33.) So, even if Children "had" to help, "not all of a tapper's work would qualify as" violating international law "if performed by a child." (*Id.*) Appellants have no answer.

*Finally*, Appellants' failure to follow Local Rule 56.1 affords them no basis for relief. While they argue that their brief was "close enough," they do not dispute their failure to comply with the rule. (Op.Br.57-59.) "[A] district court may strictly enforce compliance with its local rules regarding summary judgment motions." (A.22 (quoting S*chmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630 (7th Cir. 2010)).) Besides, Appellants have not shown any harm. The district court did not impose the (perfectly appropriate) sanction of deeming Firestone's material facts admitted; it merely stated that, while the court did its best with the record, "[t]o the extent that [Appellants'] noncompliance with the Local Rules . . . obscured a dispute as to a material fact" such a dispute was "forfeited and cannot preclude summary judgment."

(A.22.)  While Appellants argue that the district court "disregarded much of [their] evidence" (Op.Br.57), they cite no evidence disputing the dispositive facts.[32]

### D.     The District Court Correctly Ruled That An ATS Claim Cannot Be Brought Without First Exhausting Local Remedies.

Independently, summary judgment for Firestone was appropriate because Appellants failed to exhaust Liberian remedies.  *Sosa* left this question open.  542 U.S. at 733 n.21.  And this Court has suggested as much in dicta. *Enahoro*, 408 F.3d at 886.

"[T]he rule that local remedies must be exhausted before international proceedings may be instituted is a well established rule of CIL."  *Switzerland v. United States*, 1959 I.C.J. Rep 6, 26-27.  As one jurist described this rule, it is "so well entrenched" that it "needs no proof today, as its basic existence and validity has not been questioned."  *Sarei v. Rio Tinto*, 487 F.3d 1193, 1231 (9th Cir. 2007) (Bybee J., dissenting), *rev'd*, 550 F.3d 822 (9th Cir. 2008) (en banc). "[I]n applying a statute like the [ATS], where liability is predicated on 'violation of the law of nations,'" United States courts should "honor the basic tenets of public international law," such as the exhaustion requirement.  *Enahoro*, 408 F.3d at 890 n.6 (Cudahy, J., dissenting).

Appellants' main counters are procedural points under domestic law about when and how exhaustion must be raised by a defendant.  (Op.Br.61-63.)  To be sure, some authorities state that exhaustion in international law is

---

[32] Contrary to Appellants' suggestion, the deficiency in their brief was not that their factual section was incorrectly labeled.  (Op.Br.57-58.)  It was that their brief did not respond to Respondent's statement of undisputed facts.

"procedural." *Sarei*, 487 F.3d at 1231 (Bybee J., dissenting).  However, others maintain that it is a "substantive" element without which no violation of international law can exist.  *Id.* at 1234.  That this debate exists means that there can be no "universally recognized" violation of international law without local remedies being exhausted.  Appellants' failure to exhaust Liberian remedies thus also supported summary judgment for Firestone.

## II.  THE JUDGMENT OF THE DISTRICT COURT ALSO SHOULD BE AFFIRMED BECAUSE THE ATS DOES NOT APPLY TO CONDUCT IN FOREIGN TERRITORY.

Alternatively, although the district court did not accept this argument (A.37 n.15), Count II cannot proceed because the ATS cannot be used against conduct in Liberia.  The ATS was enacted to address the United States Government's "incapacity to deal with" such matters as the Marbois Incident, where a "French adventurer" assaulted the Secretary of the French Legion in Philadelphia.  *Sosa*, 542 U.S. at 715.  The ATS's precursor, enacted by the Continental Congress, called for courts to hear claims for assaults on Ambassadors "received as such by the United States in Congress assembled" and for "violation of safe conducts or passports, expressly granted under the authority of Congress."  21 J. Cont. Cong. 1136-37 (cited by *Sosa*, 542 U.S. at 716).  No evidence exists that the ATS sought to cast a net for these acts extending across the borders of other sovereign nations.

An early Attorney General opinion by William Bradford, cited by *Sosa* as authority on the meaning of the ATS (542 U.S. at 721), is in accord.  Asked whether suit could be brought in federal court against Americans who

participated in an assault on a British Colony in Sierra Leone, Bradford responded that suit could be brought only for conduct committed on the high seas.  1 Op. Att'y Gen. 57 (1795).  So far as "the transactions complained of originated or took place *in a foreign country*, they are not within the cognizance of our courts; nor can the actors be legally prosecuted or punished for them by the United States."  *Id.* at 58.[33]  Bradford's interpretation is, in turn, consistent with the view of Oliver Ellsworth—the principal drafter of the ATS and, later, Chief Justice of the Supreme Court—"that the United States lacked legislative jurisdiction over transactions in foreign countries."[34]

Other considerations support this reading.  *First*, as stated in the only appellate opinion on point, since the time the ATS was enacted, American law has recognized a presumption against extra-territoriality:  "When a statute gives no clear indication of an extraterritorial application, it has none."  *Sarei v. Rio Tinto*, 625 F.3d 561, 563 (9th Cir. 2010) (en banc) (Kleinfeld, J., dissenting); *United States v. Palmer*, 16 U.S. 610, 630-31 (1818) (the federal piracy statute

---

[33] The argument that Bradford's reference to "cognizance" encompasses only criminal jurisdiction is untenable.  At the time of Bradford's opinion, the ATS gave district courts "cognizance . . . of all causes where an alien sues for a tort only in violation of the law of nations."  *Sosa*, 542 U.S. at 712 (quoting Act of Sept. 24, 1789, ch. 20, § 9(b), 1 Stat. 79).  If Bradford were referring only to criminal jurisdiction, the part of the sentence following the semi-colon would be superfluous.  1 Op. Att'y Gen. at 58 (transactions that "took place in a foreign country . . . are not within the cognizance of our courts; nor can the actors be legally prosecuted or punished by the United States").

[34] William R. Casto, *The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the Law of Nations*, 18 Conn. L. Rev. 467, 485-86 n.97 (1986) (citing Letter from Chief Justice Ellsworth to Jonathan Trumbull (March 13, 1796)).

should not be read to apply to foreign nationals on a foreign ship).[35]  In *Sarei*,
Judge Kleinfeld dissented from the court's order directing the parties to non-
binding mediation because the Court of Appeals "plainly lack[ed] jurisdiction"
over the underlying case involving an ATS claim for torts in foreign territory.
625 F.3d at 562.  The ATS "does not say one way or the other" whether it
applies extraterritorially—so it does not.  *Id.*  This presumption has special
force with the ATS, for "it is risible to think that the first Congress wrote the
Alien Tort Statute intending to enable federal courts to adjudicate claims of war
crimes committed abroad."  *Id.* at 563.  "The point of the Alien Tort Statute was
to keep us out of international disputes, not to inject us into them."  *Id.* at 564.

*Second*, an Act of Congress should not be construed to violate the law of
nations "if any other possible construction remains."  *Weinberger v. Rossi*, 456
U.S. 25, 32 (1982) (quoting *Murray v. The Charming Betsy*, 2 Cranch 64, 118
(1804)); *F. Hoffman La-Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004).
This presumption applies with particular force where, as in the ATS context, a
court is creating common law.  *Sosa*, 542 U.S. at 725-728.  As Justice Breyer
explained in the antitrust context in *F. Hoffman La-Roche*, applying federal law
to conduct that is "significantly foreign *insofar as that conduct causes
independent foreign harm and that foreign harm alone gives rise to the plaintiff's
claim*" violates CIL.  542 U.S. at 165-66; Restatement (Third) of Foreign
Relations Law of the United States §§ 402, 403.  This rule applies "even where

---

[35] *In re Estate of Ferdinand E. Marcos*, 978 F.2d 493, 500 (9th Cir. 1992),
which pre-dated *Sosa* and therefore misapprehended that ATS claims are
governed by federal common law rather than foreign tort law, is no longer good
law.

nations agree about primary conduct," because they may "disagree dramatically about appropriate remedies." *F. Hoffman La-Roche*, 542 U.S. at 167; *Sosa*, 542 U.S. at 727 ("[t]he creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not").

Misunderstanding Firestone's argument, the district court framed the issue as whether the ATS applies to conduct outside the United States' territory, and rejected that argument as inconsistent with Bradford's opinion that the ATS provides jurisdiction over conduct on the high seas.  (A.18 n.15.) Firestone does not contend that conduct on the high seas is outside the jurisdiction of the ATS (or of the federal admiralty statute, 28 U.S.C. § 1333). The high seas are within the shared jurisdiction of all states.  *The Apollon*, 22 U.S. 362, 371 (1824).  Firestone argues only that conduct *in foreign territory*, where a State exercises its own exclusive jurisdiction, is outside the jurisdiction of the ATS.  For this reason, in the alternative, summary judgment on Count II should be affirmed.

**III.  THE DISTRICT COURT CORRECTLY DETERMINED THAT, IF SUMMARY JUDGMENT HAD NOT BEEN GRANTED TO FIRESTONE ON COUNT II, THE POTENTIAL LIABILITY PERIOD FOR FIRESTONE COMMENCED ON THE DATE WHEN CONVENTION 182 CAME INTO FORCE IN LIBERIA.**

Although unnecessary in light of the court's other rulings, the court was correct that if there was any actionable norm, it would have come from ILO

Convention 182, and thus could not be actionable before June 2004, when that convention came into force for both the United States and Liberia.[36]

Appellants' contention (Op.Br.48) that an "international consensus" prohibiting unsafe child labor existed when Convention 138 came into force is irrelevant because, as explained above, CIL is created by State practice, not abstract "consensus."  It is also incorrect because Convention 138 came into force when it had been ratified by only two States—Gaddafi's Libya and Ceausescu's Communist Romania.  *See* Convention 138, Art 12(2); http://www.ilo.org/ilolex/cgi-lex/ratifce.pl?C138 (last visited March 27, 2011). The notion that an agreement between these two rogue States created a "consensus"—let alone international obligations binding on every country in the world—is absurd.[37]

## IV. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION IN DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION AND DENYING PETITIONERS' MOTION TO AMEND.

Finally, the district court did not abuse its discretion when it denied Appellants' motion for leave to add Liberian law claims to this case.

*First*, because the district court would have declined to exercise supplemental jurisdiction over the claims, there was no reason to add them to

---

[36] Liberia was the later of the two to ratify the convention.  The district court cut off liability at June 2003, likely because the briefing mistakenly suggested the convention came into force for Liberia upon its ratification.  In fact, it did not come into force until "12 months after the date on which its ratification has been registered."  Convention 182, Art. 10(2).

[37] Convention 138 was not widely ratified until much later.  By 2000, it was ratified by only 82 of the 175 States that are members of the ILO.  *See* http://www.ilo.org/ilolex/cgi-lex/ratifce.pl?C138.  The United States and Liberia still have not ratified it.

the case.  Supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right."  *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).  Congress expressly permitted a court to decline to exercise supplemental jurisdiction where it has "dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c)(3).  This Court has made clear that district courts should "relinquish jurisdiction over state law claims that remain after the dismissal of federal claims" unless (1) the state law claims may not be re-filed because a statute of limitations has expired, (2) substantial judicial resources have been expended on the state claims, or (3) it is clearly apparent how the state claims are to be decided.  *Dargis*, 526 F.3d at 990.  As set out above, the ATS claim (the last remaining federal claim) was properly adjudicated in Firestone's favor.  And none of the exceptions is met:  dismissal would not create limitations issues with the Liberian claims (*see* 28 U.S.C. § 1367(d)); they were never filed, so no judicial energy was spent on them; and they would be tricky to adjudicate.

Congress also provided that "district courts may decline to exercise supplemental jurisdiction over a claim" if, among other things, "the claim raises a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1).  And this Court has made clear that "plaintiffs who seek innovations in state law are ill advised to choose a federal court as their forum."  *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1234 (7th Cir. 1993).  This principle applies with even

greater force when a plaintiff seeks to create new common law, not of a state, but of a foreign country.[38]

As the court here found, this case "was already complex before the addition of foreign causes of action"; the Liberian claims would "be difficult for the Court to research because of the lack of widely available Liberian legal materials in this country"; "Liberia is presumably interested in enforcing its own laws"; and "there are significant logistical difficulties associated with litigating the legality of conduct one continent away from where it occurred." (A.2-3.)  These considerations amply supported the court's decision not to exercise supplemental jurisdiction over the Liberian claims.  *See, e.g.*, *Romero*, 552 F.3d at 1318 (declining to exercise jurisdiction over Columbian law claims based on difficulties in researching and resolving the complexities of Colombian law); *see also In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214 (D. Kan. 2010); *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 825 F. Supp. 73 (D. Del. 1993); *Elbex Video, Ltd. v. Tyco Int'l, Ltd.*, No. 06-5178, 2008 WL 1375883, at *8 (D. N.J. Apr. 9, 2008).  Indeed, Appellants do not cite a single case where a district court was held to have abused its discretion by declining supplemental jurisdiction over foreign law claims.

*Second*, Appellants' dilatory tactics independently supported denial of leave to add Liberian claims.  The original complaint, filed in 2005, attempted to state California tort claims.  (R.2.)  The district court dismissed them in

---

[38] The problem is exacerbated because no mechanism exists to certify novel questions to the Liberian Supreme Court for resolution.  *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1222 (D. Kan. 2010).

June 2007 because Appellants failed to articulate any basis for applying California law.  (R.40 at 73-74.)  They then waited 10 months before attempting to add *Indiana* tort claims.  (R.112.)  The Court denied that motion because Appellants failed to articulate any plausible basis for applying Indiana law. (R.129 at 5.)  Appellants then waited for nine more months, only asking to add Liberian law claims on the day defendants moved for summary judgment.

Plaintiffs cannot have the right to amend their complaint any time it looks like a defendant might be able to defeat it.  And as the district court found, allowing the amendment would likely have required reopening discovery.  (A.2.)  These reasons, too, supported denial of the motion to add Liberian claims.  *Cowen v. Bank United of Texas FSB*, No. 94 C 3838, 1995 WL 38978, *9 (N.D. Ill. Jan. 25, 1995), *aff'd*, 70 F.3d 937, 944 (7th Cir. 1995); *Johnson v. Methodist Med. Ctr.*, 10 F.3d 1300, 1303-04 (7th Cir. 1993) (leave to amend properly denied where it was sought four years after the case was filed and after defendant moved for summary judgment).  At the least, there was no abuse of discretion.  *Aldridge v. Forest River, Inc.*, __ F.3d __, 2011 WL 781469, at *4 (7th Cir. Mar. 8, 2011) (noting that denial of leave to amend a complaint is reversed only where court "refus[ed] to grant the leave without *any* justifying reason") (emphasis added).

**CONCLUSION**

The judgment of the district court should be affirmed.

Dated:  March 30, 2011                    Respectfully submitted,


                                   ___/s/_____
                                   Brian J. Murray
                                      (*Counsel of Record*)
                                   JONES DAY
                                   77 W. Wacker Drive, Suite 3500
                                   Chicago, IL 60601
                                   (312) 782-3939

                                   Robert A. Mittelstaedt
                                   David L. Wallach
                                   JONES DAY
                                   555 California Street, 26th Floor
                                   San Francisco, California  94104
                                   (415) 626-3939

                                   *Attorneys for Defendant-Appellee*
                                   *Firestone Natural Rubber Co.*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,958 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 2007 in Bookman Old Style 12pt.

Dated:  May 30, 2011

_____/s/_____
Brian J. Murray

## CIRCUIT RULE 30(D) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all materials

required by Circuit Rule 30(a) and (b) are included in the appendix.

Dated:  March 30, 2011


  /s/
Brian J. Murray

## CIRCUIT RULE 31(E) CERTIFICATION

The undersigned hereby certifies that he has filed electronically, pursuant to Circuit Rule 3l(e), versions of the brief and all of the Appendix items that are available in a non-scanned PDF format in this appeal.

Dated:  March 30, 2011



Brian J. Murray

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that he caused two copies of

the foregoing BRIEF FOR DEFENDANT-APPELLEE FIRESTONE NATURAL

RUBBER CO., and one digital copy of the same, to be delivered via UPS,

overnight delivery, to:

| | |
|---|---|
| Terrence Collingsworth | Kimberly D Jeselskis |
| Christian Levesque | JESELSKIS LAW OFFICES |
| CONRAD & SCHERER, LLP | 120 E. Market St., Suite 1030 |
| 1156 15th St. NW, Suite 502 | Indianapolis, IN  46204 |
| Washington, DC  20005 | (317) 632-0000 |
| (202) 543-4001 | |

This 30th day of March, 2011.


＿＿/s/＿＿＿＿＿＿＿＿＿＿＿＿＿
Brian J. Murray